**MONTGOMERY v. UNITED STATES.**

No. 14115.

United States Court of Appeals
Fifth Circuit.

April 17, 1953.

---

RIVES, Circuit Judge.

Appellant, defendant below, was convicted of willfully and knowingly attempting to defeat and evade a large part of the income tax due and owing by him and his wife for the years 1948, 1949 and 1950, 26 U.S.C.A. § 145(b).[1] Defendant was the sheriff of Tarrant County, Texas, and his trial and conviction followed close upon the heels of the trial and conviction of A. L. Wardlaw, Assistant District Attorney for that County. See Wardlaw v. United States, No. 14,105, 5 Cir., 203 F.2d 884. The court sentenced the defendant to serve a three year term of imprisonment on Count III, four years on Count IV, which sentences were directed to run consecutively, and two years on Count I to run concurrently with the sentences imposed on Counts II and III, making a total of seven years to serve. Appellant has appealed from the judgment of conviction assigning thirty-two specifications of error, only a few of which we find it necessary to consider.

There was no error in admitting in evidence the income tax return of the defendant and his wife for the year 1948 notwithstanding the return was not signed by either of them. It was sufficiently identified as their return. It bore the stamp of the Collector's office:

"Rec'd With Remittance
Mar 14 1949
75 Coll. Int. Rev.
2nd Dist. Tex."

The accompanying payment was by check, a photographic copy of which was admitted in evidence, dated March 12, 1949, payable to the Collector of Internal Revenue and signed by the defendant. One of the witnesses testified that he could tell the check was received with the return, because a serial number was stamped on both the check and the return when they were re-

Howard Dailey and Clyde G. Hood, Clyde W. Mays, Dallas, Tex., Dave Miller and Mays & Mays, all of Fort Worth, Tex., for appellant.

R. Daniel Settle, Sp. Asst. to U. S. Atty., Frank B. Potter, U. S. Atty., and Cavett S. Binion, Asst. U. S. Atty., Fort Worth, Tex., for appellee.

Before HUTCHESON, Chief Judge, and HOLMES and RIVES, Circuit Judges.

1. "(b) *Failure to collect and pay over tax, or attempt to defeat or evade tax.* Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

ceived by the Collector and the serial number on the two instruments was the same; and, further, that the balance due as shown on the return was the same amount as that for which the check was drawn. In fact, the defendant himself on cross-examination stated that he presumed it was his original return, "It corresponds with everything". Though not signed, the return was filed by defendant as his return, and intended to be received as such by the Collector, and was properly admitted in evidence. Emmich v. United States, 6 Cir., 298 F. 5.

At the end of the direct testimony of the witness W. H. Getzendaner, the district judge summarized the result of a lengthy examination as follows:

"It seems that the witness has a recollection of having paid fifty dollars in '48, that he has no definite recollection of making more than one payment. That he made two payments in 1949, he has no definite recollection of paying more. That he made one payment of seventy-five dollars in 1950, but that he is unable to say if he made more, or, when.

"That seems to be the limit of his positive knowledge on the subject."

Defendant's counsel then proceeded vigorously to cross-examine this witness. Among other things, he asked the witness to name other officers to whom he had paid bribe money during the years in question, and upon objection by the Government explained his theory to the court as follows:

"Mr. Hood:

"It affects his credibility in this way, Your Honor, he is testifying in 1948 he paid this defendant fifty dollars to operate a place there in the city limits, with the police department, the investigators of the District Attorney's Office, there are eight constable precincts over there, had jurisdiction over the matter, and Texas Rangers, and State Highway Patrol, and he said he paid fifty dollars to the sheriff. We want to show how the sheriff protected him

from all the others; it goes to affect his credibility."

The court permitted the questioning to proceed, but in a short time interrupted as follows:

"The Court:

"We have grave doubt about the correctness of the Court's ruling in compelling this man to testify in the first instance, that testimony had reference to the matter under inquiry. And now, to go into a field that was not under inquiry is, I believe, one in which he could further claim his right of self-incrimination, against self-incrimination. I think I will advise the witness that the order that we entered requiring him to testify in the other case does not further extend, and at the noon hour I am going to examine the authorities, and I may strike his entire testimony."

Defendant's counsel was then permitted to ask some further questions, but not the names of the persons to whom the witness claimed he had paid bribe money. When the session was resumed after the noon recess, the court announced:

"The Court:

"I have studied the law on the subject we had under consideration, and I adhere to my ruling and leave everything stand as it is."

The Government insists that the effect of that ruling was that the testimony sought to be elicited by defendant's counsel might be considered by the jury. Defendant's counsel evidently understood otherwise, as evidenced by his statement, "note our exception", and his failure further to cross-examine the witness.

If this witness' claim of constitutional immunity was to be denied, and we think that was proper, it had to be denied *in toto* so as to accord the defendant the benefit of cross-examination however searching. "Cross-examination of a witness is a matter of right", Alford v. United States of America, 282 U.S. 687, 691, 51 S.Ct. 218, 219, 75 L.Ed. 624. See J. E. Hanger, Inc., v. United States, 81 U.S.App.D.C. 408, 160

F.2d 8; Jianole v. United States, 8 Cir., 299 F. 496. Indeed, cross-examination, as has been often observed, is the surest test yet devised of the truthfulness of a witness' testimony, and its allowance is especially important in the case of a witness who is himself an admitted violator of the law. We think that the action of the court was an undue restriction on the defendant's right to cross-examine this witness.

 Getzendaner was the only witness who testified to outright bribery of the defendant. Another witness, Clarence Cleere, was permitted to testify over the defendant's objection that the defendant called him to his office where the following conversation ensued:

"A. He said, 'You haven't been to see me.' I said, 'I didn't know I had anything to come to see you—'

"The Court: What is that? A. I said, 'I didn't know that I had any reason to come to see you.'

"He said, 'Did you know that operating these pinball games was illegal?'

"I told him that I didn't interpret the law that anything of that device was illegal.

"He said, 'These other boys have come to see me and you never.' He said, 'I want you to bring me fifty dollars a month, to this office, and I am not coming after it.'

"Mr. Dailey: We object to that as irrelevant and immaterial and inflammatory, and highly prejudicial, and of no probative force, for the reason this witness will testify, as I understand, that he never paid the sheriff a nickel in his life. If he didn't, what he is saying is highly irrelevant and immaterial and prejudicial and inflammatory.

\* \* \* \* \* \*

"Mr. Hood: May I ask the witness a question?

"The Court: Yes.

"Mr. Hood: Did you ever, in the years 1948, 1949 or 1950, pay the sheriff one dime? A. No, sir.

"Mr. Hood: We renew our objection as being highly irrelevant and immaterial and inflammatory and prejudicial."

The district judge could exercise a broad discretion in admitting this type of testimony to show that defendant's "motive in not reporting his illegal gains was to keep as secret as possible the fact that he was receiving income which it was a criminal offense to accept", Chadick v. United States, 5 Cir., 77 F.2d 961, 964, as well as "to establish the possible source of the funds used for the expenditures which so substantially exceeded appellant's declared available resources", United States v. Chapman, 7 Cir., 168 F.2d 997, 1000. The fact that the evidence objected to tended to establish that the accused committed offenses other than those charged in the indictment would be no justification for excluding it if it tended also to establish the commission of the crime charged in the indictment, Capone v. United States, 7 Cir., 51 F.2d 609, 619, 76 A.L.R. 1534. We think, however, that the jury should have been cautioned that the evidence was admitted only for the light that it might throw on the federal offenses on trial, and that no inference of guilt could be drawn merely from the commission of other offenses different in character. In short, the jury should not convict the defendant of income tax evasion because they concluded that he was a grafter. See Railton v. United States, 5 Cir., 127 F.2d 691; Lurding v. United States, 6 Cir., 179 F.2d 419.

Mr. Justice Frankfurter in his concurring opinion in Johnson v. United States, 318 U. S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704, stated: "In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure." When the testimony and the parts of the arguments copied in the record are read in an effort to "re-live the whole trial", we can see the difficulty of the task faced by court and jury in confining their consideration to the federal offenses on trial. That difficulty but emphasizes the precautions that should be observed by the court and

the district attorney to insure the defendant a fair trial on the offense alone with which he was charged.

The third and last witness, who was placed on the stand by the Government to testify along the same line as Getzendaner and Cleere, was Ernest Cavitt, a colored man who operated a small tavern where beer was served and where a dice game was sometimes played. He testified that the defendant never asked him to pay anything for "running crap games" and that he did not pay him any bribes, but that he had paid about $25.00 every two or three months just as a gift up to a total which would not exceed $300.00.

There was evidence from the defendant and from his wife of large gifts from a friend, Paul Suggs. The defendant claimed that at a period of his life when he was engaged in professional boxing, he was making considerable money and loaned Suggs $3,000.00 with which to go in business; that Suggs had made a financial success, and was thereafter generous in his gifts to the defendant. Suggs was not offered as a witness, and in explanation the defendant introduced a clipping from a Los Angeles, California, paper regarding the violent death of Suggs and his family. The defendant excepted to the court's charge "because the court has not instructed the jury that it may consider, take into consideration, this defendant may have acquired some moneys from the source of gifts, as testified to in this record." We would not be willing to hold the overruling of this exception to be reversible error in view of the fact that the court in the course of its oral instructions did charge the jury as follows:

> "You are also instructed that true, bona fide gifts to a taxpayer are not subject to the payment of income tax. Whether or not a gift or the passing of money or valuables is a true and bona fide gift may be a matter for the jury to consider in the determination of any case involving tax returns."

Under the "net worth-expenditures" method by which the Government undertook to prove the charges contained in the indictment, it was necessary that the increase in net worth or the expenditures, or both added together, justify the finding that the defendant had some substantial unreported income, the exact amount of which need not be proved. United States v. Johnson, 319 U.S. 503, 517, 63 S.Ct. 1233, 87 L. Ed. 1546. Any gifts or other non-taxable receipts explaining part of the increase in net worth or expenditures must, of course, be deducted, and care must be taken not to include expenditures more than once. United States v. Caserta, 3 Cir., 199 F.2d 905. According to an article in the American Bar Association Journal (March, 1953, Vol. 39, p. 251) describing the method, it is now attempted in almost all fraud cases. In our recent case of Pollock v. United States, 5 Cir., 202 F.2d 281, 284, we noted that in a criminal case this kind of evidence "being circumstantial, must exclude in the minds of the jury every reasonable hypothesis other than the guilt of the defendant". In that case, the Government connected up its necessary proof by statements of the taxpayer and of his wife, but we noted that those statements were obtained "after due warning of their constitutional rights". In the present case, Special Agent Baskett testified that the defendant was never so warned, and that he never at anytime told the defendant that any document that was surrendered to him or his fellow agents would be used in either a civil or criminal prosecution against him. The defendant testified that, when Baskett and Government Agent Wilson first came to see him about his income tax matters, they told him that it was a routine check up, and that on each occasion he conferred with them, they told him it was purely a civil matter, that they would soon let him know how much taxes he owed, if any, and allow him to pay them, and that at no time was it intimated to him that there might be a criminal prosecution.[2]

---

2. In this prosecution for felony the unusual situation exists that 26 U.S.C.A. § 3761 authorizes the compromising of any civil or criminal case arising under the Internal Revenue laws. See Willingham v. United States, 5 Cir., 208 F. 137; Rau v. United States, 2 Cir., 260 F. 131.

At the conclusion of the testimony, the Government introduced into evidence over the defendant's objection its Exhibit No. 20, including all figures of claimed expenditures for the years in question, both those taken from the record, testimony from witnesses to whom money had been paid, as well as those testified to by Baskett that he had gained from statements and admissions of defendant and his wife, cancelled checks, receipts and documents which appellant had surrendered to him.

We do not think the circumstances under which the statements of the defendant and of his wife, and the cancelled checks and documents, were obtained were sufficient of themselves to require that that evidence be excluded on the ground of being involuntary as a matter of law, or to require that the Government's Exhibit No. 20 based in part upon such testimony be not admitted in evidence. All of those circumstances were matters which went to the weight or credibility of the testimony thus obtained. Wilson v. United States, 162 U.S. 613, 624, 16 S.Ct. 895, 40 L.Ed. 1090; Powers v.

United States, 223 U.S. 303, 314, 32 S.Ct. 281, 56 L.Ed. 448; Wood v. United States, 75 U.S.App.D.C. 274, 128 F.2d 265, 269, 141 A.L.R. 1318; Nicola v. United States, 3 Cir., 72 F.2d 780, 784; Shushan v. United States, 5 Cir., 117 F.2d 110, 117, 133 A.L.R. 1040; Hanson v. United States, 8 Cir., 186 F.2d 61; Barshop v. United States, 5 Cir., 192 F.2d 699.

Baskett was the Special Agent for the Bureau of Internal Revenue assigned to investigate the case. His investigation began in February, 1951, and lasted until March, 1952, during which time he contacted the appellant some twelve to fifteen times and upon each occasion made notes and transcribed them later in the day. The importance of his testimony is indicated by the fact that it occupies 233 pages of the printed record. Shortly after his direct examination began, it became apparent that he was reading from notes and the defendant's counsel objected unless they could see the notes and demanded the privilege of looking at them and reading them themselves. Their objection and demand were overruled and they excepted.[3]

**3.** "Mr. Hood: We object to the witness reading from notes on these transactions, unless we can have the notes and look them over.

"Mr. Binion: This investigation lasted over a long period of time, and we think that the witness is allowed, under the rules, to use his notes to refresh his memory, and those are the notes that he made for the purpose of refreshing his memory.

"The Court: That is the way I understand the rule. What is the position of counsel?

"Mr. Hood: We object to the witness reading from his notes. We think the correct rule is, if the notes were made at the time of the happening of the transaction, by the witness, then he can refer to them to refresh his memory. Can I ask the witness a question?

"The Court: Go ahead.

"Mr. Hood: Mr. Baskett, you are referring to some notes. Did you make those notes immediately at the time the transaction took place? A. Yes, sir, that is right.

"Mr. Hood: At the same time? A. After we finished the interview.

"Mr. Hood: At a later date? A. No, sir, right immediately after his interview.

"Mr. Hood: Did you make them in the presence of the defendant? A. No, sir.

"Mr. Hood: We object to it. A. Excuse me, we took notes while we were discussing those things.

"Mr. Hood: Are those the original notes you took at the time of the discussion? A. We took them, I took them in pencil and then I typed up my notes.

"Mr. Hood: And those are not the original notes you took down at the time you were interviewing the sheriff, are they? A. That is right.

"Mr. Hood: They are not? A. No, sir.

"Mr. Hood: Your Honor, we object. If he will refer to his original notes, we have no objection.

"Mr. Binion: The government's position is this: This investigation lasted over a period of time. On the occasions that this witness interviewed Mr. Montgomery, during the interview, as I understand it, he would jot down on a piece of paper the information that he was getting, and at a later date, or later on during the day, whatever it was, he would transcribe those notes, he personally would transcribe those notes in order to make them permanent for him to testify later, if necessary, and to make a report from.

When the cross-examination of this witness was begun defendant's counsel renewed their demand to see the notes from which he testified, but again without success.[4]

■ The law is now well settled that where a witness while he is on the stand uses any paper or memoranda to refresh his memory in giving his testimony, the opposing side, upon proper demand, has a right to see and examine that paper or memoranda and to use the same in cross-examination of the witness. Morris v. United States, 5 Cir., 149 F. 123, 126, 127; Lennon v. United States, 8 Cir., 20 F.2d 490, 493; Little v. United States, 8 Cir., 93 F.2d 401, 406.

■ Of course, a conviction will not be reversed for denial of the right to examine such notes and memoranda if the error does not affect substantial rights of the party. Rule 52, Federal Rules of Criminal Procedure, 18 U.S.C.A.; United States v. Socony Vacuum Oil Co., 310 U.S. 150, 234, 60 S.Ct. 811, 84 L.Ed. 1129.

■ It is not clear from the record how much of this witness' testimony was based upon his references to notes, papers and memoranda, inspection of which was refused to defendant's counsel, but apparently the witness refreshed his recollection from such sources often. His testimony was material and was highly damaging to the defendant. We conclude that the court committed reversible error in denying to the defendant's counsel the right to examine the notes, papers and memoranda which were used by the witness for the purpose of refreshing his memory.

In view of our opinion in Wardlaw v. United States, No. 14,105, supra, and touching some questions raised also in this case, we think that it is not necessary to pass upon the other specifications of error. The judgment of conviction is reversed and the cause remanded for a new trial.

Reversed and remanded.

---

"The Court: How much time do you think intervened between the time you jotted down the first note and the time you reduced it to the present form? It was made the same day.

"The Court: I think I will let him look at it to refresh his memory. I think you are really invoking a rule which might apply if it was being offered itself.

"Mr. Hood: We would like the privilege of looking at those notes and reading them ourselves.

"Mr. Settle: We are not offering the man's notes.

"The Court: I will let him testify from his notes.

"Mr. Hood: May we look at them?

"The Court: When you cross examine him, we will get at that.

"Mr. Hood: We except."

4. "Q. What did you do during that time, from February until April, you testified you made notes, didn't you? A. That is right.

"Q. Let me see those notes?

"Mr. Settle: Now, Your Honor, he is asking the witness to show him notes which the witness had, which were not put in evidence, and which he used to refresh his memory from. I don't think he is entitled to look at the notes that the witness has to refresh his memory from, unless they are introduced in evidence, and they were not introduced in evidence.

"The Court: I will hear the question.

"Mr. Hood: The witness said he was reading from notes.

"Mr. Settle: No, he didn't.

"By Mr. Hood: Q. What were you doing? A. I was refreshing my memory.

"Q. How did you refresh your memory, unless you were reading them? A. Why certainly.

"Q. Then you had to read them? A. Yes.

"Q. And after you read them you gave that testimony from them? A. Yes, sir.

"Q. All right, let me see the notes.

"Mr. Binion: We object to that.

"Mr. Hood: All right, if they don't want us to see what they have.

"The Court: Gentlemen of the jury, you will try the case on the facts that the Court submits to you, and not any suggestion that counsel may make. Go ahead with your case.

"Mr. Hood: As I understand, I am not allowed to see the notes that he testified from?

"The Court: I don't see that that is necessarily proper. If a man makes a memorandum or a record of the thing, I don't think you should go into it.

"Mr. Hood: All right, note our exception."